STATE of North Dakota, Plaintiff
and Appellee,

v.

Elwin John FONTAINE, Defendant
and Appellant.

Cr. No. 1121.

Supreme Court of North Dakota.

Feb. 20, 1986.

Hjellum, Weiss, Nerison, Jukkala, Wright & Paulson, Jamestown, for defendant and appellant; argued by Thomas E. Merrick.

Charles J. Gilje, State's Atty., Jamestown, for plaintiff and appellee.

ERICKSTAD, Chief Justice.

The defendant Elwin John Fontaine appeals from a district court conviction of the crime of gross sexual imposition, finding him to be a dangerous special offender, and ordering him to be imprisoned in the State Penitentiary for a period of 30 years. We affirm.

At approximately 7:20 a.m., on the morning of Saturday, November 24, 1984, Dynae Gorman was suddenly awakened when the bed covers were thrown off her. Immediately after being awakened, Dynae observed a man with his pants down attempting to climb on top of her. The man

grabbed her wrist with one hand and held it down and covered her mouth with the other hand. He then said, "Don't holler or scream; I have a gun and I will kill you." After attempting to have intercourse with Dynae for approximately 15 to 20 minutes, the man got up and left the bedroom and house.

After the man left, Dynae locked the front door and called her husband. Dynae's husband arrived shortly and the police were called. Dynae gave a description of the intruder to the police officers when they arrived at her home. Later in the day Dynae again described the intruder and the clothes he was wearing from which a composite drawing was made. This composite was made available to police officers and was also published in the Jamestown newspaper.

Fontaine was arrested as a suspect in the crime on Monday, November 26, 1984. A criminal complaint was filed in the County Court of Stutsman County, November 30, 1984, charging Fontaine with the crime of gross sexual imposition in violation of Section 12.1–20–03(2)(b), N.D.C.C. Fontaine was declared by the court to be indigent and counsel was appointed for him. After Fontaine's motion for change of venue was granted, the matter was transferred to Richland County for a trial commencing on May 7, 1985. Following a trial by jury, Fontaine was convicted of gross sexual imposition, a class A felony.

After the conviction, the State alleged that Fontaine was a dangerous special offender under Section 12.1–32–09, N.D.C.C., and urged that he should be sentenced accordingly. A hearing was held on June 24, 1985, at which time the court received evidence from the State in support of its position that Fontaine was a dangerous special offender. After reviewing the evidence the court found Fontaine to be a dangerous special offender. The court sentenced Fontaine to 30 years in the State Penitentiary.

Three issues have been raised on appeal:

1) Whether or not Fontaine was indigent within the meaning of Rule 44, N.D.R.Crim.P., when he did not have sufficient income and resources to secure his release on bond.

2) Whether or not the trial court abused its discretion by not permitting Fontaine's expert witness to answer a hypothetical question based on facts and evidence about the validity of the eyewitness's identification.

3) Whether or not Fontaine's State and Federal Constitutional rights to counsel were violated when prior convictions were considered in sentencing where the record did not indicate that Fontaine had or waived counsel.

I

Article I, Section 12, of the North Dakota Constitution guarantees that "[i]n criminal prosecutions in any court whatever, the party accused shall have the right ... to appear and defend in person and with counsel." This basic right is also guaranteed by the Sixth Amendment of the United States Constitution. Article I, Section 11, of the North Dakota Constitution provides "[a]ll persons shall be bailable by sufficient sureties.... Excessive bail shall not be required, nor excessive fines imposed...." Rule 44 of the North Dakota Rules of Criminal Procedure provides that "[a]bsent a knowing and intelligent waiver, every indigent defendant is entitled to have counsel appointed at public expense to represent him at every stage of the proceedings from his initial appearance before a magistrate through appeal in the courts of this state in all felony cases."

The same day the criminal complaint was filed the court determined Fontaine to be indigent and appointed counsel to represent him in all matters pertaining to this action. On February 27, 1985, approximately three months after the court had appointed counsel for Fontaine, the State made a motion to review the indigency status of Fontaine. After reviewing the evidence which indicated that Fontaine had recently become entitled to social security benefits in the sum of $7,334.20, the court revoked his indigency status.

Fontaine is not asserting that he was denied his right to counsel at any stage of the proceedings. His objection relates to the court's order revoking his indigency status. Fontaine's argument seems to focus on the fact that bail was set by the court at $10,000 cash and his financial resources were insufficient to cover this expense and secure his release from jail.

When determining eligibility for defense services pursuant to Section 27–20–26, N.D.C.C., the trial court should give consideration to the defendant's (1) income resources, (2) non-income resources, (3) expenses and liabilities, and (4) estimated costs of defense services. *Financial Guidelines for Eligibility for Defense Services for Indigent Defendants Pursuant to Section 27–20–26, NDCC*, North Dakota Legal Counsel for Indigents Commission. When determining whether or not a defendant is indigent within the meaning of Rule 44, N.D.R.Crim.P., "consideration should be given to (a) the cost of providing the person and his dependents with the necessities of life, and (b) the cost of a defendant's bail bond if financial conditions are imposed." *State v. Jensen*, 241 N.W.2d 557, 562 (N.D.1976).

■ The cost of bail is only one of the considerations in determining the indigency of a defendant. An inability to provide bail does not automatically classify a defendant as indigent.

The financial guidelines established by the North Dakota Legal Counsel for Indigents Commission suggests that a single person whose annual gross income is below $6,225 should be eligible for public paid defense services. While these are only guidelines and are not mandatory, it should be noted that Fontaine's income was above the level suggested by the North Dakota Legal Counsel for Indigents Commission.

We also find it significant that bail was fixed at $10,000 on November 30, 1984, a time when Fontaine was represented by counsel. It was not until March 18, 1985, more than three and a half months later, that Fontaine's indigency status was revoked.

■ Fontaine alleges on appeal that, as a result of his indigency status being revoked, he was without an attorney for a period of two weeks. Assuming this assertion to be true, Fontaine has failed to show how he was in any way prejudiced by this action. The record indicates that the revocation of Fontaine's indigency status did not put any undue burden upon Fontaine or disrupt the flow of court proceedings. We conclude, therefore, that Fontaine was not prejudiced by the court's order revoking his indigency status.[1]

## II

At the trial Fontaine called as a witness Dr. Ruth Maki, an Associate Professor of Psychology at North Dakota State University. Dr. Maki's field of specialty is in human memory. The State made a motion to disallow any testimony from Dr. Maki concerning eyewitness identification. The court denied this motion and allowed the witness to testify. The State then asked the court to not allow the witness to answer a hypothetical question based on the specific facts and testimony of that case. The specific question which counsel for Fontaine intended to ask Dr. Maki was:

"[T]he hypothetical situation is one in which a man has come into the bedroom of a woman, and for approximately 15 to 20 minutes was on top of that woman, attempting to rape her, the woman said that for almost that entire time she was looking up into the face of her attacker from a distance of a few inches; the lighting, according to the witness, was sufficient, although it was early in the morning before sunrise; the next time that the woman saw this person was two

---

1. While we have concluded that Fontaine has not been prejudiced by the revocation of his indigency status, it may have been more appropriate for the court not to have revoked Fontaine's indigency status, but instead to have considered a civil collection process at the end of the court's proceedings as is recommended by the financial guidelines adopted by the North Dakota Legal Counsel for Indigents Commission.

days later; at that time she was presented a photo lineup consisting of five photographs, one of which was the defendant; she was unable to identify the defendant or anyone else in the photographs; within five minutes the woman saw the defendant from a distance of four to ten feet following a gesture by a police officer pointing to the defendant. Given those stated facts, would you be able to come to an opinion as to the accuracy of the eyewitness identification?"

The court concluded that allowing that hypothetical situation to be answered would be "invading the province of the jury." Accordingly, the court disallowed the question.

 On appeal, Fontaine is arguing that the trial court abused its discretion when it prevented Dr. Maki from answering the hypothetical question. Rules 702 through 706 of the North Dakota Rules of Evidence govern the admissibility of testimony by expert witnesses. The test for admission of expert testimony is whether or not such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and whether or not the witness is qualified as an expert. *State v. Ohnstad*, 359 N.W.2d 827, 841 (N.D.1984); *State v. Skjonsby*, 319 N.W.2d 764, 790 (N.D.1982); *South v. National R.R. Passenger Corp.*, 290 N.W.2d 819, 831 (N.D.1980). The determination to admit or not to admit expert testimony rests within the sound discretion of the trial court, and its determination will not be reversed on appeal unless the court has abused its discretion. *State v. Ohnstad*, 359 N.W.2d at 841; *State v. Skjonsby*, 319 N.W.2d at 790; *South v. National R.R. Passenger Corp.*, 290 N.W.2d at 831.

While the issue of whether or not an expert witness should be permitted to testify concerning the accuracy of an eyewitness identification is one of first impression in North Dakota, a substantial number of other jurisdictions have addressed this issue. *See Commonwealth v. Francis*, 390 Mass. 89, 453 N.E.2d 1204, 1207–08 (1983);

*United States v. Thevis*, 665 F.2d 616, 641–42 (5th Cir.1982), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *State v. Galloway*, 275 N.W.2d 736, 741 (Iowa 1979) for lists of such cases. *See also, State v. Poland*, 144 Ariz. 388, 698 P.2d 183 (1985), *cert. granted*, — U.S. —, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985); *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984); *State v. Ammons*, 208 Neb. 797, 305 N.W.2d 812 (1981); *Hampton v. State*, 92 Wis.2d 450, 285 N.W.2d 868 (1979). The overwhelming majority of the courts that have addressed this issue have held that the trial court did not abuse its discretion when it refused to permit an expert to testify concerning the validity of a particular eyewitness's identification. *State v. Galloway*, 275 N.W.2d at 741; *United States v. Thevis*, 665 F.2d at 641–42; *Commonwealth v. Francis*, 453 N.E.2d at 1207–08.

We are aware of only a few cases which have held it was an abuse of discretion for the trial court to not permit the testimony of an expert concerning an eyewitness's identification. *People v. McDonald*, 208 Cal.Rptr. 236, 690 P.2d 709; *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). In *Chapple*, the Arizona Supreme Court held that the lower court's order precluding the testimony was legally incorrect and was unsupported by the record. 660 P.2d at 1224. The court, however, limited its holding to the particular facts of that case. *Chapple*, 660 P.2d at 1224; *State v. Poland*, 698 P.2d at 194. *See also, Commonwealth v. Francis*, 453 N.E.2d at 1207 n. 5. In *McDonald*, the California Supreme Court held that the trial court erred in not permitting expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the eyewitness's identification. 208 Cal. Rptr. at 254, 690 P.2d at 708. The court in *McDonald* stated, however, that "the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; like the court in *Chapple*, 'we do not intend to "open the gates" to a flood of expert

evidence on the subject.'" 208 Cal.Rptr. at 254, 690 P.2d at 708.

■ The determination to admit expert testimony under Rule 702 rests within the sound discretion of the trial court, and its determination will not be disturbed on appeal unless the court has abused its discretion. *Victory Park Apartments, Inc. v. Axelson,* 367 N.W.2d 155, 163 (N.D.1985); *Patch v. Sebelius,* 349 N.W.2d 637, 643 (N.D.1984). A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Shervold v. Schmidt,* 359 N.W.2d 361, 363 (N.D. 1984); *Eisenzimmer v. City of Balfour,* 352 N.W.2d 628, 631 (N.D.1984). The record discloses that before ruling on this issue, the trial court listened to and considered the arguments of both parties and heard the question which would have been presented to the expert witness. The court then concluded,

"I guess I would like to have it come in to see what the answer would be, but I am not going to. I will allow you to question this witness on her expertise in this field. That may be a little general but I believe ... you are getting into specifics and it is invading the province of this jury."

The trial court[2] reached an appropriate balance when it permitted Dr. Maki to testify concerning the difficulty of eyewitnesses to properly identify persons, but did not permit an answer to the hypothetical question. Accordingly, we hold that the district court did not abuse its discretion.

The State has urged us to extend our decision further to conclude that the district court abused its discretion when it allowed the general testimony of this expert witness. The State refers us to numerous cases in which it has been held that a lower court did not abuse its discretion when it refused to permit any expert testimony on the subject of eyewitness identification. In his concurring opinion in *State v. Galloway,* Chief Justice Reynoldson of the Iowa Supreme Court states:

"The commentators urge that experts like Professor Loftus should be permitted to testify in order to demonstrate the general unreliability of the memory of identification witnesses....

"However, research has produced not a single appellate decision in which such expert testimony was held admissible or its exclusion held to be an abuse of discretion." 275 N.W.2d at 740–41.

Notwithstanding the implication of that statement, as this issue is not determinative of the outcome of this case, we will not decide it today.

### III

We will now address the final issue which is whether or not Fontaine's State and Federal Constitutional rights to counsel were violated when prior convictions were considered in sentencing where the record did not indicate that Fontaine had, or waived, counsel.

Fontaine was convicted of a class A felony which carries "a maximum penalty of twenty years' imprisonment, a fine of ten thousand dollars or both." Section 12.1–32–01(2), N.D.C.C. "A court may sentence a convicted offender to an extended sentence as a dangerous special offender" if Section 12.1–32–09(1), N.D.C.C., is satisfied. If the court determines that the convicted offender is a dangerous special offender, and "[i]f the offense for which the offender is convicted is a class A felony, the court may impose a sentence up to a maximum of life imprisonment." Section 12.1–32–09(2)(a), N.D.C.C. The district court, in determining that Fontaine should be classified as a dangerous special offender, found that the defendant was a dangerous, mentally abnormal person. From the presentence report, including a psychiatric examination and the evidence at trial, the court concluded that the defendant's conduct had

2. The court did allow Dr. Maki to testify to various factors which affect one's ability to remember. The factors discussed by Dr. Maki included light, the angle from which a person is seen, time, distance, the amount of the person's face exposed, the witness's expectations and beliefs, and the amount of stress that is experienced by the witness.

been characterized by persistent, aggressive behavior, and that such behavior made him a serious danger to other persons. The court also found "that the defendant was convicted of an offense which seriously endangered the life of another person, and the offender had previously been convicted of a similar offense." The similar offense relied upon by the court was a counseled conviction of gross sexual imposition in Grand Forks County in 1983. We believe these findings by the court, which have not been challenged by Fontaine, comply with the requirements of (1)(a) and (1)(d) of Section 12.1–32–09, N.D.C.C.

Notwithstanding these findings by the district court, Fontaine appears to be arguing that his previous conviction record does not support the court's finding that he is a dangerous special offender under subsection (1)(c) of Section 12.1–32–09, N.D.C.C.[3] If he is contending that all the provisions under subsection (1) of 12.1–32–09 must be satisfied before a defendant may be classified as a dangerous special offender, we do not agree. This is contrary to the language of the statute which allows a court to sentence a convicted offender as a dangerous offender "upon a finding of any *one* or more" of the factual situations described in subsection (1). [Emphasis added.] Section 12.1–32–09(1), N.D.C.C.

It is apparent that the court also properly found Fontaine to be a dangerous special offender under (1)(c) of 12.1–32–09 because he was convicted of gross sexual imposition, a class B felony, on October 5, 1983, and "two offenses potentially punishable by imprisonment classified below class B felony." The two lesser offenses were disorderly conduct on December 17, 1975, and menacing on July 19, 1979. The record indicates that these offenses were committed at different times, that Fontaine was an adult, and that he was represented by counsel in conjunction with all three of these convictions.

Fontaine's argument could be construed to mean that because some of the offenses listed in the FBI report and elsewhere in the record do not show on their face to be counseled, the court is prohibited from considering those convictions which were counseled. Our view is that such an argument would be unreasonable in this case in light of the district court's order which indicates the court relied upon the counseled convictions when making the determination that Fontaine was a dangerous special offender.

For the reasons stated herein, the judgment of the district court is in all respects affirmed.

GIERKE, VANDE WALLE and LEVINE, JJ., concur.

MESCHKE, Justice, concurring specially.

I concur fully with parts I and III of the majority opinion. I concur with the result in part II. I write separately to suggest some different lines of reasoning on the admission and exclusion of expert testimony.

---

**3.** "1. A court may sentence a convicted offender to an extended sentence as a dangerous special offender in accordance with the provisions of this section upon a finding of any one or more of the following:

"a. The convicted offender is a dangerous, mentally abnormal person. The court shall not make such a finding unless the presentence report, including a psychiatric examination, concludes that the offender's conduct has been characterized by persistent aggressive behavior, and that such behavior makes him a serious danger to other persons.

 * * * * * *

"c. The convicted offender is a persistent offender. The court shall not make such a finding unless the offender is an adult and has previously been convicted in any state or states or by the United States of two felonies of class B or above, or of one class B felony or above plus two offenses potentially punishable by imprisonment classified below class B felony, committed at different times when the offender was an adult. For the purposes of this subdivision, a felony conviction in another state or under the laws of the United States shall be considered a felony of class B or above if it is punishable by a maximum term of imprisonment of ten years or more.

"d. The offender was convicted of an offense which seriously endangered the life of another person, and the offender had previously been convicted of a similar offense." Section 12.1–32–09

The trial court's reasoning in disallowing the hypothetical question to the expert, because it would be "invading the province of the jury," was inappropriate under our rules of evidence. N.D.R.Ev. Rule 704 says:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

The reason for and effect of this rule is explained in the Notes of Advisory Committee to the Federal Rules of Evidence, from which our rule is derived:

"The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule is specifically abolished by the instant rule. "The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. 7 Wigmore §§ 1920, 1921; McCormick § 12. The basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.' 7 Wigmore § 1920, p. 17. Efforts to meet the felt needs of particular situations led to odd verbal circumlocutions which were said not to violate the rule.

\* \* \* \* \* \*

"Many modern decisions illustrate the trend to abandon the rule completely.

\* \* \* \* \* \*

"The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. \* \* \* \*" Fed.R.Evid. 704 advisory committee note (*Federal Criminal Code and Rules*, West Publishing Company, 1985 Revised Edition, pp. 242–3.)

I believe that the view suggested by the majority opinion, and of the cases cited by it, as to the admissibility of expert testimony on the potential unreliability of eyewitness identification, may be too narrow, contrary to our rules of evidence. N.D. R.Ev. Rule 702 says:

"*Testimony by Experts* If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The explanation of this Rule in Notes of Advisory Committee to the Federal Rules, from which our Rule 702 was derived, suggests a much broader approach:

"An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge. The most common source of this knowledge is the expert witness, although there are other techniques for supplying it.

"Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts. Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that opinions are not indispensable and to encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw

the requisite inference. The use of opinions is not abolished by the rule, however. It will continue to be permissible for the experts to take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts. See Rules 703 to 705.

"Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore § 1918.

"The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' and 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed.R.Evid. 702 advisory committee note (*Federal Criminal Code and Rules,* West Publishing Company, 1985 Revised Edition, p. 241).

In the context of a case like this, I believe it is also desirable to call attention to N.D.R.Ev. Rule 703 which provides that "the facts or data" reasonably relied upon by an expert in his particular field "need not be admissible in evidence." Thus, I believe the approach of our applicable rules differs fundamentally from the approach of Chief Justice Reynoldson in *State v. Galloway,* 275 N.W.2d 736, 740 (Iowa, 1979).

It has been observed that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.... A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). This Court has struggled with the problems of eyewitness identification, *State v. Denny,* 350 N.W.2d 25, 30 (N.D. 1984), and no doubt will have to do so in the future. Thus, I would not foreclose the reliability of eyewitness identification as a subject of expert opinion evidence.

Since I concur with the majority that the trial court did not abuse its considerable discretion in this case, I see no need to suggest or imply any limitations on that discretion in future cases.